## MILLERS' INDEMNITY UNDERWRITERS v. BOUDREAUX et al.   (No. 874.)*

(Court of Civil Appeals of Texas. Beaumont. Dec. 9, 1922. Rehearing Denied Dec. 20, 1922.)

1. **Admiralty ⊂⊃20—Evidence held not to show cause of action maritime.**

Cause of action arising out of death of diver in a navigable stream working off a floating barge *held* not shown by the evidence to be maritime in nature, as regarded right to compensation under the Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91).

2. **Master and servant ⊂⊃403—Burden on compensation insurer to show maritime nature of injury.**

In a suit against indemnity underwriters to set aside an award of Industrial Accident Board denying liability for death of servant, the burden rested on the underwriters to show that plaintiffs' cause of action was maritime in its nature as claimed.

3. **Pleading ⊂⊃34(7)—Petition construed in light of all reasonable intendments where questioned first on appeal.**

Where appellant raises for the first time on appeal the question of the sufficiency of appellees' petition in the court below, appellees' petition should be construed in the light of all reasonable intendments arising from its allegations.

4. **Pleading ⊂⊃193(1)—Defective statement not subject to general demurrer.**

A defective statement of a cause of action is not subject to a general demurrer, being good if amendable.

5. **Master and servant ⊂⊃401—Petition held to sufficiently allege employer was subscriber under Compensation Act and defendant was insurer.**

Petition, in suit to set aside an award in insurer's favor denying liability for the death of a servant under the Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), *held* as against objection first raised on appeal to sufficiently allege that the employer was a subscriber under the Compensation Act and that defendant was the insurer of such employer at the time of servant's death.

6. **Master and servant ⊂⊃405(1)—Evidence held to show defendant issued policy to employer under Compensation Act.**

In a suit to set aside an award denying liability for the death of a servant under the Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), evidence *held* sufficient to show that defendant had issued a policy to the employer under the terms of the Workmen's Compensation Act.

7. **Master and servant ⊂⊃417(4½)—Failure to give proper notice of appeal held waived by compensation insurer.**

Where the Industrial Accident Board made its award on December 7, 1920, and those en-

titled to compensation, filed their original petition on December 10, 1920, to set aside the award, and defendant insurer filed its original answer December 26, 1920, within the 20 days allowed applicants by law to give notice to it of their appeal from the award, defendant waived all defenses, both as to the manner of service of the notice and as to its sufficiency.

**8. Master and servant ⏘386(1)—Award of maximum compensation warranted.**

Where there was evidence that at time diver met his death the average monthly wages of divers was from $300 up, and that such wages had not been less within the preceding 12 months, and the deceased was employed at a salary of $300 per month and was killed on the first day of his employment, and had not worked for some weeks, or months, prior to the day of his death, *held*, that an award of the maximum compensation of $15 per week was fully sustained by the evidence, within Workmen's Compensation Act, pt. 4, § 1 (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—82).

**9. Appeal and error ⏘1071(1)—Conclusion in judgment as to other facts being undisputed held not prejudicial.**

Appellant cannot complain of a conclusion in the judgment of the trial court, "All other facts necessary to plaintiff's recovery being admitted and undisputed," where it fails to call attention to any fact found by the court under such conclusion, or any fact, not expressly found, which would have to be inferred or found by the appellate court, and would rest for its support on this conclusion.

**10. Master and servant ⏘418(5)—Admission of evidence in compensation case as to earnings held harmless.**

No reversible error was committed by the court in admitting in evidence a report made by the employer to the Industrial Accident Board to the effect that the average monthly wages of deceased servant was $300, where the evidence on the issue was without dispute and report showed nothing which was not already before the jury.

**11. Master and servant ⏘418(5)—Admission of letters in evidence in compensation case held harmless.**

In a suit to set aside an award by the Industrial Accident Board in favor of insurer, admission in evidence of letters from the Accident Board to the insurer and from the insurer to the Board *held* not subject to the objection that they were "highly prejudicial to appellant and of such nature as to cause, and probably did cause, the jury to render an improper verdict against defendant on controlling issues of fact."

**12. Master and servant ⏘404—Testimony in compensation case held admissible to show cause of death.**

In a suit to set aside an award in insurer's favor denying liability for death of servant under Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), where the issue was whether the servant died of natural causes or from suffocation, while employed as a diver, testimony as to the appearance of the deceased about a day after his death was admissible; its weight being a question for the jury.

**13. Master and servant ⏘405(4)—Finding of compensable injury causing death of diver sustained.**

In a suit to set aside an, award denying liability for death of diver under Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), evidence *held* sufficient to sustain a finding of the jury that death was caused from suffocation and that it did not result from natural causes.

**14. Master and servant ⏘418(5)—Error in admission of evidence in compensation case as to cause of death held harmless.**

In a suit to set aside an award denying liability for the death of a diver under the Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), any error of the court in permitting a witness to testify that, when a man dies underneath the water in a diving suit, generally the cause of his death is insufficient air, was not reversible, where the overwhelming weight and preponderance of the evidence was that the servant met his death by suffocation and not by reason of heart failure as contended for by defendant.

Appeal from District Court, Orange County; J. B. Forse, Special Judge.

Suit by E. J. Boudreaux and others against the Millers' Indemnity Underwriters. Judgment for plaintiffs, and defendant appeals. Affirmed.

Morris & Barnes, of Beaumont, and Ed. S. McCarver, of Orange, for appellant.

Howth & O'Fiel, of Beaumont, for appellees.

WALKER, J. This suit was instituted in the district court of Orange county by appellees against appellant to set aside the award which the Industrial Accident Board had made in appellant's favor denying liability for the death of O. O. Boudreaux, under the provisions of the Workmen's Compensation Act. All the brothers and sisters of O. O. Boudreaux, deceased, were parties plaintiff in the original petition; but, before judgment was entered, all of them except his sister Mrs. E. J. Braud and her husband were dismissed from the suit. The case was tried to a jury on the following special issues, which were answered as indicated:

(1) "Was the death of O. O. Boudreaux from natural causes, or was it caused from suffocation? Answer: "From suffocation."

(2) "Did the deceased, O. O. Boudreaux, contribute to the support of Mrs. E. J. Braud?" Answer: "Yes."

(3) "Was Mrs. E. J. Braud dependent upon the deceased, O. O. Boudreaux, for support in whole or in part?" Answer: "In part."

---

⏘For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

(4) "What amount of money would 60 per cent. of O. O. Boudreaux's weekly wages be for 360 weeks?" Answer: "$16,200."

On the verdict of the jury thus returned, judgment was entered in favor of Mrs. E. J. Braud for the compensation allowed by law. Appellant has duly perfected its appeal from this judgment. The facts are disclosed in the opinion.

We will first consider appellant's proposition that appellees' cause of action, if any they had, was of an admiralty and maritime nature, and exclusively cognizable in a court of admiralty; that as applied to the facts of this case the Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91) of this state is violative of article 3, § 2, article 1, § 8, and the Fourteenth Amendment of the federal Constitution, and that the district court of Orange county had no jurisdiction over plaintiffs' cause of action, and its judgment on the merits was therefore void and of no effect. On this issue the facts are as follows:

At the time of his death, O. O. Boudreaux was employed by the National Shipbuilding Company as a diver, and was working in the waters of the Sabine river, a navigable stream between Texas and Louisiana. In the full equipment of a diver, he was sent down into the waters of this river from a barge. Mr. Arrington testified:

"Yes, sir; ocean-going vessels come in and out of this river all the time, and the tide comes up this river, past Orange. The place where Boudreaux was working was on the Sabine river, and he was working from a barge with pumps and things on it that he was working from. It was floating on the water. As to whether it was over where he was working, it was near it; wasn't over it. His connection with the outside world came from this barge he was working from. The pump and all equipment except what he had was all on this barge or pontoon. They carried that pontoon about, where they wanted to work. It was a floating barge. It was just a small barge, had a little house on it for him to dress in, dressing room, and pumps and equipment that they had. Just a small boat with a house built on it."

We also quote as follows from the testimony of L. J. Kerr:

"My name is L. J. Kerr. I live in Orange, and have lived here about four years. I was with the National Shipbuilding Company on the 17th day of April, 1920, when Mr. Boudreaux died. I was foreman of launching all ships, and tending to the construction of all river work and dismantling the work in the river. I was in charge of the work Mr. Boudreaux was doing. He was a diver. I had known Mr. Boudreaux about two years. As to what he had been doing prior to this time, Mr. Boudreaux used to work for the International Shipbuilding Company as a diver, and on several occasions when we needed an extra diver he was working for the National Shipbuilding Company as a relief man. As to whether I had seen him prior to this time during the prior six or eight months, I don't remember just how long it was, but we never used but the one diver up to this particular time when we needed another. Mr. Boudreaux was in the service of the government and had not been back very long when the company hired him to do this particular work. I do not know what he was doing for the preceding six or eight months before he did this diving. As to the nature of the work he was doing, it was a set of ways that was formerly used for launching ships, and the National Shipbuilding Company decided to do away with that set of ways, or part of it, a hundred feet of it, in order to extend the wharf, and we were dismantling and cutting out those ways. There was no boat on those ways. The last one had been launched on that set of ways. We were dismantling them in order to extend the wharf so as to dismantle some boats the National Shipbuilding Company had bought. Yes, sir; we were taking those out to get the boats in. Yes, sir; that was an obstruction to navigation, and we were taking the obstruction away. No, sir; I was not present when Mr. Boudreaux went down. As to whether he had gone down that day before this time, yes, sir; he went down before noon. He went down something between 11 and 12 o'clock. The purpose of going down was to get familiar with his work and see the conditions of it, what his work was. I had given him an outline of the work with the blueprint, but he wanted to get familiar himself with it, and try the pressure of the air. He hadn't worked under any pressure for some time before, and he wanted to see how he would stand it. Yes, sir; he wanted to try it out, and get familiar with the work. Mr. Boudreaux did not make any statement to me as to why he was going down there at that time and state his reasons for going down, other than what I have said. The place he was working from was a barge, with a house on it, and a pump set in the middle. It was a barge about 12 feet wide and possibly 18 feet long, with about an 8x10 cabin on it. That barge was about 35 feet from shore, out in the Sabine river, and he went down from that barge into the river. There was a ladder attached from the barge down into the water so he could go back and forth, climb up and down. This ladder did not go to where his work was, just 5 or 6 feet in the water, enough for him to submerge."

The record does not disclose in detail the character of the business of the National Shipbuilding Company. The deceased met his death on the first day of his employment as a diver. The terms of his contract with the National Shipbuilding Company, its duration, and the character of the work to be performed by him, are not shown by the record, other than as disclosed in the testimony copied above.

In Home Life & Accident Co. v. Wade, 236 S. W. 778, we recently applied the rule announced by the Supreme Court of the United States in the Jensen Case, 244 U. S. 205, 37

Sup. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas 1917E, 900, as we then understood it, and held that the cause of action therein asserted was maritime in its nature, and exclusively cognizable in a court of admiralty. A writ of error was granted against our holding, after being dismissed by the Supreme Court for want of jurisdiction. Hence it would appear that our holding in that case was most carefully reviewed by our Supreme Court, and after such a review the writ was granted. Since our decision in that case, the Supreme Court of the United States has further discussed the relation of state Workmen's Compensation Acts to the maritime law of the nation in Western Fuel Co. v. Garcia, 257 U. S. 233, 42 Sup. Ct. 89, 66 L. Ed. 210; Grant-Smith-Porter Ship Co. v. Rohde, 257 U. S. 469, 42 Sup. Ct. 157, 66 L. Ed. 321; and Industrial Commission v. Nordenholt Corp., 258 U. S. ——, 42 Sup. Ct. 473, 66 L. Ed. ——. We did not have these cases before us at the time we filed our opinion in the Wade case. As we now understand the questions involved in appellant's proposition, we do not think the Wade case was correctly decided, especially so in view of the fact that a writ was granted against our holding.

Recently, in an opinion by the Chief Justice of this court, in Lumbermen's Reciprocal Association v. Adcock, 244 S. W. 645, we held that the Workmen's Compensation Act of this state covered injuries received while one, engaged in work on navigable waters, working from a small boat, was injured in his efforts to take sunken logs out of the water.

[1, 2] The burden rested on appellant to show that appellees' cause of action was maritime in its nature. We do not believe this burden was met by a simple showing that the deceased met his death under the circumstances related in the testimony of the witnesses as above given.

[3] Appellant raises for the first time in this court, by supplemental brief filed herein on the 15th day of November, 1922, the following assignment of fundamental error:

"The court erred in rendering judgment against the defendant because the plaintiff's petition did not allege that the National Shipbuilding Company, the employer of deceased, was a subscriber under the Workmen's Compensation Act of Texas, nor that defendant was the insurer of the National Shipbuilding Company under the Workmen's Compensation Act, at the time of his death, and the pleadings are insufficient to support the judgment."

As against this assignment, appellees' petition should be construed in the light of all reasonable intendments arising from its allegations. Appellees allege that—

At the time of the death of O. O. Boudreaux, he "was duly and regularly employed by the National Shipbuilding Company, and that on and prior to the date of his death, and on the date of the injury sustained by him, the relation of employee and employer duly and regularly existed between the National Shipbuilding Company and the said O. O. Boudreaux. * * *

"These plaintiffs present , that within the period of 30 days after the death of the said O. O. Boudreaux while in the employment of the National Shipbuilding Company, as aforesaid, that notice of his said death while so employed was given to and had by his said employer and to the Industrial Accident Board and to the Millers' Indemnity Underwriters, the insurer in this cause, and that within six months after the death of the said O. O. Boudreaux these plaintiffs and each of them made claim for compensation to the said Industrial Accident Board and to the said Millers' Indemnity Underwriters, insurers and the defendants herein, as provided by law, and are now bringing this suit to set the award and ruling of the Industrial Accident Board made in this cause aside and recover the compensation to which they shall show themselves entitled herein. Plaintiffs gave notice of the death of O. O. Boudreaux within 30 days after his death to defendant and the Industrial Accident Board; that they presented their claim on account of his death within six months after his death to the defendant and the Industrial Accident Board; that the Industrial Accident Board made its award; and that within 20 days thereafter plaintiffs gave notice of their intention not to be bound by the same to the defendant and the Industrial Accident Board and that within 20 days thereafter plaintiff filed this suit to recover against the defendant.

"These plaintiffs further present that the said O. O. Boudreaux was employed by the said National Shipbuilding Company, as a diver, at Orange, Tex., and that on the date of his decease he was sent below by his said employers to perform his task as a diver, and these plaintiffs believe, and have good reasons to believe, that while under the water the supply of air furnished the said O. O. Boudreaux became fouled, or that he was furnished an insufficient supply of air, or that in some manner the supply of air was cut off for the time being, so that the said O. O. Boudreaux died from suffocation.

"Wherefore, the premises considered, plaintiffs and each of them pray the court that the Millers' Indemnity Underwriters, insurers, and that citation issue to them as required by law, and that on trial hereof that these plaintiffs recover the amount of compensation to which they shall be entitled as against said Millers' Indemnity Underwriters, for the costs of suit, and that the said decree and judgment of the Industrial Accident Board made in this cause on the 7th day of December, 1920, be set aside, and in the alternate they recover the cost of burial, $500, for such other and further relief, of a nature either legal or equitable, special or general in law or in equity, as to which they and each of them shall show themselves entitled, and of this the plaintiffs will in duty bound respectfully ever pray."

[4, 5] There is no specific allegation that the National Shipbuilding Company was a "subscriber" under the Workmen's Compensation Act, nor, except as given above, any specific

allegation that appellant was the insurer of the National Shipbuilding Company under the terms of the Workmen's Compensation Act. "A defective statement of a cause of action is not subject to a general demurrer. If it is so stated that it is amendable, it is good against such demurrer." Northwestern National Insurance Co. v. Woodward, 18 Tex. Civ. App. 496, 45 S. W. 187; Telegraph Co. v. Grimes, 82 Tex. 94, 17 S. W. 831. There was an allegation that Boudreaux was an employee of the National Shipbuilding Company, and that appellant was the insurer, and on these allegations plaintiffs based their recovery, and prayed for damages. No recovery could have been had except on the theory that the National Shipbuilding Company was a subscriber, and that appellant was the insurer. These allegations did not 'exclude the inference that the National Shipbuilding Company was a subscriber and carried a policy of insurance with appellant under the terms of the Workmen's Compensation Act. Appellant is described by appellee as "the insurer." What meaning should be given to these allegations? What are the reasonable intendments arising therefrom?

In Northwestern National Life Insurance Co. v. Woodward, supra, the plaintiff sought recovery under a policy of fire insurance, covering a certain house which was destroyed by fire within the terms of the policy. Discussing the proposition now before us, Judge Neill said:

"Plaintiffs' petition, as stated, does not specifically aver an insurable interest at the time of the loss, but it contains this averment: 'Which said loss or damage did not occur directly or indirectly under circumstances which by the terms and conditions of said policy, or any of them would absolve the defendant from liability therefor, but on the contrary said loss or damage did occur under circumstances and in a manner which would and did render defendant liable therefor.' The appellant would not have been liable to appellees unless they had an insurable interest at the time of the loss, and the allegation that the loss happened under circumstances which rendered defendant liable therefor cannot be true, as admitted by the general demurrer, unless the insurable interest continued and was in existence at the time of the loss. It is thus seen that the fact that appellees owned an insurable interest in the property at the time of the disaster is clearly inferable from the other facts alleged in the petition, as this inference, when the petition is assailed by a general demurrer, must be taken as an alleged fact."

In Gulf Refining Co. v. Bonin, 242 S. W. 776, an opinion by this court, we said, in discussing a petition which failed to contain a specific allegation that a servant was a vice principal:

"If every reasonable intendment is indulged in favor of appellee's petition, we believe that the issue of vice principal was duly pleaded. He alleged 'that the injuries to and death of said minor child, Porter Bonin, were proximately caused by the negligence of the defendant, by and through its agent and employee aforesaid,' and, referring to the specific acts of negligence pleaded by appellee, 'that the defendant was guilty of negligence attributable to it in each and all of the particulars aforesaid.' Some effect must be given to these allegations. Appellee was trying to state a cause of action. He alleged that the death of Porter Bonin was caused by the negligence of appellant. He alleged that the acts of Habermacher were attributable to appellant. That could be true only if Habermacher was a vice principal. No special exceptions were urged against these allegations. Standing unchallenged, we believe they were sufficient to admit evidence of the fact that Habermacher was a vice principal."

Had exceptions been urged, appellees' petition could have been amended by allegations showing more in detail its liability as insurer; but appellant is not entitled to such special exceptions under the assignment of fundamental error. The jurisdiction of the district court of Orange county to entertain this case did not rest on the performance of any antecedent duty which was not fully alleged, such as presenting the claim to the Industrial Accident Board, disposition by the Board of the claim, notice of appeal, etc. In our judgment, the two cases just cited are conclusive against appellant's assignment.

[6] We cannot sustain appellant's proposition that there is no evidence in the record that it had issued a policy to the National Shipbuilding Company under the terms of the Workmen's Compensation Act. There is no specific evidence on this point, that is to say, no witness testified directly that such a policy had been issued; but we believe the issue was raised by the evidence. After the death of O. O. Boudreaux, a claim under the Workmen's Compensation Act was filed with the Industrial Accident Board. Thereupon the Board wrote appellant the following letter:

"April 30th, 1920.
"In re O. O. Boudreaux v. National Shipbuilding Co.

"Millers' Indemnity Underwriters, Dallas, Texas—Gentlemen: Notice has been received in this department from the National Shipbuilding Company of Texas to the effect that a fatal injury was sustained to O. O. Boudreaux, whose address is given as La Fouche, La., on April 17th, 1920. We presume that similar notice has been sent to you.

"As soon as you have made your investigation in this case, we would appreciate it if you would advise the Board your attitude with reference to the payment of compensation.

"Your usual prompt attention to the matter will be greatly appreciated.

"Yours very truly, Industrial Accident Board, "E. L.          By ————, Secretary."

Appellant replied to the letter of the Industrial Accident Board as follows:

"Millers' Indemnity Underwriters,

"Dallas, Texas, May 4, 1920.

"SB4648

"Industrial Accident Board, Austin, Texas—Gentlemen: In re Your No. F–3777, O. O. Boudreaux, Deceased, v. National Shipbuilding Company. We have the secretary's letter of April 30th advising that notice of fatal injury had been received by the Board in case above styled. So far we have not received any notice of fatal injury or claim for compensation and will have to ask that the Board advise us of the name and address of the person filing the notice with the Board, together with the relationship of such person to the deceased before we can state what our position will be with regard to the payment of compensation.

"We received a report of accident from the National Shipbuilding Company and have investigated the case. However, in the absence of any claim for compensation we do not think it would be proper for us to state our position with regard to payment of compensation.

"Yours truly,

"HBH–c [Signed] Bailey & Collins, Managers."

These letters clearly show that the Board referred this claim to appellant as the insurer; that the National Shipbuilding Company had made a report of the accident to appellant, and appellant, after having investigated the claim, made no denial that it was the insurer. In fact, as we construe these letters, they raise the issue that appellant was the insurer. Except on that theory, why should the National Shipbuilding Company have made to it a report of the accident? The matter having been referred to it as the insurer, and the claim having been investigated by it, why did it not deny such relation? Of course, if the issue was raised that appellant had issued a policy of insurance under the Workmen's Compensation Act for the benefit of the National Shipbuilding Company, the issue was also raised that the National Shipbuilding Company was a "subscriber" within the terms of that act. Appellant admits that it had received notice of the accident from the National Shipbuilding Company. From the evidence offered, it clearly appears that the National Shipbuilding Company was qualified to be a subscriber under the terms of the Workmen's Compensation Act. Hence we overrule both these propositions.

[7] We understand that appellant has waived its assignment raising the point that appellees failed to give the proper notice of appeal. However, there is nothing in that contention. The Board made its award on the 7th day of December, 1920. Appellees filed their original petition in this cause on the 10th day of December, 1920. Appellant filed its original answer on the 26th day of December, 1920. By answering appellees', petition within the 20 days allowed them by law in which to give notice to it of their appeal from the award of the Industrial Accident Board, appellant waived all defenses,

both as to the manner of service of the notice and as to its sufficiency. Georgia Casualty Co. v. McClure (Tex. Civ. App.) 239 S. W. 644.

[8] The judgment of the trial court awarding the appellees the maximum compensation of $15 per week is fully sustained by the evidence. The evidence is without dispute that at Orange, where deceased met his death, the average monthly wages of divers was from $300 up, and that such wages had not been less than this sum within the preceding twelve months. The deceased was employed at a salary of $300 per month and, as we have already seen, was killed on the first day of his employment. The evidence shows that he had not worked for some weeks, possibly months prior to the day of his death. But the facts we have given bring this case clearly within section 1, pt. 4, of the Workmen's Compensation Act, which is as follows:

"If the injured employee shall not have worked in such employment during substantially the whole of the year, his average annual wages shall consist of three hundred times the average daily wage or salary which an employee of the same class working substantially the whole of such immediately preceding year in the same or in a similar employment in the same or in a neighboring place, shall have earned in such employment during the days when so employed."

[9] The judgment of the court contains the following conclusion:

"All other facts necessary to plaintiffs' recovery being admitted and undisputed."

While appellant complains of this conclusion and makes it the basis of its seventeenth proposition, yet it fails to call to our attention any fact found by the court under this conclusion or any fact not expressly found which would have to be inferred or found by us and would rest for its support on this conclusion. Hence it does not appear that appellant has suffered any injury because of the matters complained of.

[10] No reversible error was committed by the court in admitting in evidence the report made by the National Shipbuilding Company to the Industrial Accident Board, to the effect that the average monthly wages of deceased was $300. The evidence on this issue was without dispute, and the report showed nothing which was not already before the jury.

[11] The court did not err in admitting in evidence the letters above quoted, from the Industrial Accident Board to appellant and from appellant to the Board, as against the objections that they were "highly prejudicial to appellant and of such nature as to cause, and probably did cause, the jury to render an improper verdict against appellant on controlling issues of fact." Appellant did not deny receiving the letter from the Board, nor the writing of the letter to the Board.

We see nothing objectionable in either of these letters.

[12] The testimony of E. J. Boudreaux as to the appearance of the deceased about a day after his death was admissible. Its weight was a question to be determined by the jury. As to the physical appearance of deceased immediately after his death. Fernest Dannees testified:

"Well, I see him dead; that is all I see. I see his face is in a bad shape. * * * That is all; I see him dead. The place where I first saw him dead was on that barge. Yes, I saw the body on the barge. That was about 10 minutes before 4 o'clock. It was on Saturday. It was in the month of April, 1920, and on a Saturday, and about 20 or 10 minutes before 4. And Mr. Boudreaux was dead when I saw him. Yes, I saw his body lying on the barge, and the barge was in the river, this river here at Orange, the Sabine river. * * * As to how he looked, how his face looked, he got bad face. That is all I know; I see his bad face, and his arms looked tight. He has got bad eyes, bulged out. The color of his face was blue black. As to whether his face was its regular size or swelled out, it no swell out, just a little bit in the neck."

L. J. Kerr testified:

"I would judge that there was about four inches of water in that diving suit. Yes, sir; inside the suit, about the bottom of the feet. As to whether, when we brought this man to the surface after he was dead, and exposed him, took the diving suit off him, whether his eyes were bulged, popped a little, will say, yes; as soon as I saw him I knew he was dead. I saw the condition that he was in, and I knew if I didn't get the helmet off him, his face was going to be so swollen that I couldn't get it off him without cutting it off. He was swollen all over his neck and face, and had had a hemorrhage from his nose. His eyes were bulged a little, too. He had a hemorrhage from his nose, but I wouldn't say positively about the ears. I do remember the hemorrhage from his nose. His face was a bluish cast. As to whether it was reddish bluish black cast, it wasn't black; it was reddish. Yes, it was livid. And his lips were swollen, too. I didn't see whether his tongue was thick. His face was distorted. As to whether he seemed tense, like when you tense your muscles, no, if he had been anything like that, we couldn't have gotten the suit off without cutting it. Yes, sir; I do remember his face was of a dark, red, livid, appearance; his face was all out of shape; horrible condition. As to whether he looked like he had suffered agonies before his death, I wouldn't know whether he suffered any agonies, or just went off without it.

"Q. Would his face impress you as a man who had suffered agony before his death? A. I couldn't tell you, because I don't know the agonies of a man when he is suffering; I couldn't answer that, because I am not in a position. But I do say that his face was swollen and out of shape and horrible looking. As to whether this hemmorrhage was a considerable hemorrhage, well it is pretty hard to tell. When I saw him there was blood on each side of his nostrils, and in that water in his suit, that about four inches of water, there was a reddish cast, which showed there was blood in that. Yes, the water in the suit was tinged with blood. His lips were as large again as they should be."

Dr. W. T. Williams testified:

"My name is Dr. W. T. Williams. I live at Beaumont. I heard the testimony of Mr. Kerr, and heard him describe the appearance of the man Boudreaux when he was drawn up there and his suit was opened up, the appearance of his face, and all that. From the description that Mr. Kerr gave of Mr. Boudreaux, his appearance, and everything, swollen condition, livid expression, distorted features, I can say in my opinion as a medical man what caused his death. I have had about 27 years in the practice of medicine. This man died from suffocation, by which I mean lack of air. I say that because it presents absolutely a typical picture of a man who had died from suffocation, lack of air; the discoloration, the bulging eyes, swelling features, distortion of the face, shows evidently he was using the muscles of his lungs and face, and all the upper body for the purpose of drawing in air into his lungs. Yes, my opinion is he died of suffocation. I never saw Mr. Boudreaux in my life. I don't know anything about this case. I am basing my opinion entirely on the statement that that gentleman over there made."

[13] In our judgment, this testimony was sufficient to sustain the verdict of the jury as to the manner and cause of the death of O. O. Boudreaux. There was no error committed by the court in receiving the testimony of Dr. Williams. This testimony comes within the well-recognized rules for the reception of expert evidence.

[14] Over appellant's objection, the court permitted Nick Kahl to testify that, when a man dies underneath the water in a diving suit, generally the cause of his death is insufficient air. If this was improper testimony, we do not believe its reception should reverse this case, because, in our judgment, the overwhelming weight and preponderance of the evidence is to the effect that the deceased met his death by suffocation, and not by reason of heart failure, as appellant contends.

What we have said disposes of all propositions raised by appellant, and, finding no error in the record, the judgment of the trial court is in all things affirmed.